

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00223-CR

Carlos **FAZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court No. 2013CR10674
Honorable Kevin M. O'Connell, Judge Presiding[1]

Opinion by: Karen Angelini, Justice

Sitting: Karen Angelini, Justice
Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: July 6, 2016

AFFIRMED

After the trial court denied his motion to suppress, Carlos Faz pled guilty to driving while intoxicated (third offense or more) and true to the enhancement allegation. Pursuant to a plea-bargain agreement, he was sentenced to ten years of imprisonment. On appeal, he argues (1) the trial court erred in denying his motion to suppress; and (2) the trial court erred in denying his motion for new trial because his plea was involuntary. We affirm the judgment of the trial court.

---

[1] The motion to suppress was referred to Magistrate Judge Andrew Carruthers by the district court. Judge Carruthers's ruling then became the decree of the district court. The Honorable Kevin M. O'Connell signed the judgment of conviction.

**BACKGROUND**

At the suppression hearing, after the State stipulated that a warrantless seizure occurred, Deputy Eric Sedillo testified. Deputy Sedillo testified that on the night of March 31, 2012, he was traveling on IH-37 South, a four-lane highway, when he saw a vehicle reduce its speed in the right lane next to him. He then saw a pickup truck in front of that vehicle drift "half way onto the improved shoulder." Deputy Sedillo moved in behind the pickup truck and began following it. Deputy Sedillo saw the pickup truck drift from the lane onto an improved shoulder again and then back into the lane. According to Deputy Sedillo, he saw the pickup cross onto the improved shoulder a total of three times before he turned on his siren.

Deputy Sedillo testified that when the pickup truck drifted left, it caused another vehicle in the next lane to also move left to create space between the vehicles. Deputy Sedillo testified that the reason he stopped the pickup truck was because he observed the pickup truck drift off of the lane of travel onto the shoulder three separate times.

A dash cam video taken from the deputy's patrol car was introduced in evidence and begins when the deputy's patrol car moves behind the pickup truck. It shows the pickup truck crossing the lane's right line onto the shoulder, drifting back toward the left side of the lane, and then crossing the right line onto the shoulder again. The video shows a car in the left lane move toward the left side of the lane when it passes the pickup truck.

Deputy Sedillo testified that based on his training and experience, the type of driving he saw indicated that the driver of the pickup truck "wasn't able to operate the vehicle within the lane," causing a danger to other vehicles on the highway. Deputy Sedillo concluded that the driver of the pickup truck could not operate his vehicle in a safe manner. According to Deputy Sedillo, the driver of the pickup truck did not appear to be stopping on the shoulder as he did not activate his turn signal to move over. Nor did the driver activate his brakes to slow down like he was

attempting to stop the pickup truck. Deputy Sedillo testified that it did not appear that the pickup driver was deliberately controlling his vehicle. Deputy Sedillo was asked whether, based on his DWI training and experience, the driving pattern of the driver of the pickup truck was consistent with a person who was under the influence of alcohol or drugs. Deputy Sedillo replied in the affirmative, pointing to the "way [the driver] was operating the vehicle and the day and time." Deputy Sedillo emphasized that it was "a Saturday night" and almost midnight. Deputy Sedillo explained that most of his "DWI arrests are on Friday and Saturday nights." "It's when a lot of people are off of work and they're able to go out and consume alcoholic beverages." When asked again what it was that he observed to cause him to stop the driver of the pickup truck, Deputy Sedillo explained,

> It was the way [the driver] was operating the vehicle. When he first–when I first initially saw the vehicle partially on the shoulder, that brought my attention to it. That's why I started following it. At the last point where he — he actually came across and started getting really close to the white slotted line with other vehicles, and other vehicles catching up, you know, with him drifting back over and coming back, I didn't know whether if it was going to continue, possibly go in the other lane. And with the other traffic catching up to us, that's why I initiated a traffic stop.

Deputy Sedillo testified that after he stopped the pickup truck, he informed the driver, Appellant Faz, that "the reason he was stopped was because he failed to maintain a single lane of travel." Deputy Sedillo testified that when he stopped Faz, he "thought that [Faz] might be possibly — possibly intoxicated." Deputy Sedillo also testified that he thought that there might be "some kind of emergency" because it was "not normal driving behavior."

The trial court denied Faz's motion to suppress. After Faz requested that the trial court make findings of fact and conclusions of law, the trial court orally made the following findings of fact and conclusions of law:

> The case is here on the defense's request for findings of facts and conclusions of law. These are the Court's findings of facts and conclusions of law. The officer

observed the defendant weaving, on two wheels, crossing into the improved shoulder on three different occasions within a very short period of time. Because the defendant drifted onto the improved shoulder three times, within approximately sixty seconds, the Court finds that the officer had a reasonable suspicion that the defendant may have been driving while intoxicated. He, therefore, had a basis in law for stopping the defendant in the belief that he may have been intoxicated at the time that he was operating the motor vehicle.

### MOTION TO SUPPRESS

In his first issue, Faz argues that "Deputy Sedillo lacked reasonable suspicion or probable cause to believe [Faz] was committing a traffic violation or violating the law."[2] The State responds that Deputy Sedillo had reasonable suspicion to believe that Fax was driving while intoxicated. When reviewing a trial court's ruling on a motion to suppress, we give almost total deference to the court's determination of the historical facts that the record supports, especially when those fact findings are based on an evaluation of the witnesses' credibility and demeanor. *Leming v. State*, No. PD-0072-15, 2016 WL 1458242, at *7 (Tex. Crim. App. Apr. 13, 2016); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We accord the same level of deference to the trial court's rulings on mixed questions of law and fact if those decisions turn on the credibility and demeanor of the witnesses. *Guzman*, 955 S.W.2d at 89. We review de novo mixed questions of law and fact that do not turn on witness credibility. *Id.*

"Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). "A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Id.* "This standard is an objective one that disregards the actual

---

[2] We note that Faz challenges only the legality of the initial stop.

subjective intent of the arresting officer and looks, instead, to whether there was objectively justifiable basis for the detention." *Id.* "It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Id.*

A person commits the offense of driving while intoxicated if he "is intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE ANN. § 49.04(a) (West Supp. 2015). "Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." *Id.* § 49.01(2)(A) (West 2011). Thus, the question presented in this appeal is whether Deputy Sedillo had an objectively reasonable basis to suspect Faz, the driver of the pickup truck, to be intoxicated. *See Leming*, 2016 WL 1458242, at *8-*9.

In arguing that Deputy Sedillo did not have reasonable suspicion to stop him, Faz relies on *Curtis v. State*, 238 S.W.3d 376 (Tex. Crim. App. 2007), arguing that Deputy Sedillo "lacked extensive experience in detecting intoxicated drivers as required by *Curtis v. State*." According to Faz, "because Deputy Sedillo lacked the 23 years of extensive experience detecting intoxicated drivers the officer in *Curtis* had as required under that case, there was not reasonable suspicion to justify the stop based on suspicion of DWI." *Curtis*, however, does not stand for the proposition that an officer must have "extensive experience" before he has reasonable suspicion to justify an investigative detention.

In *Curtis*, 238 S.W.3d at 377, the appellant was stopped at 1:00 a.m. when two state troopers saw his vehicle weaving in and out of his lane over a short distance. The court of appeals reversed appellant's DWI conviction, finding the officers did not have reasonable suspicion to stop his vehicle. *Id.* at 377-78. The State's sole issue on appeal to the Texas Court of Criminal Appeals

was that the officers had reasonable suspicion to stop appellant's vehicle and that the court of appeals applied an improper standard in determining that the officers did not have reasonable suspicion to stop the vehicle. *Id.* at 378. The court of criminal appeals noted that the court of appeals had recognized the proper standard of examining the totality of the circumstances, but had failed to apply that standard. *Id.* at 379. The court of criminal appeals pointed out that the phrase "totality of the circumstances" did not even appear in the court's discussion regarding reasonable suspicion. *Id.* at 380. The court of criminal appeals noted that the court of appeals had failed to take into account all the factors the officers recounted, including one of the officer's extensive experience in detecting intoxicated drivers. *Id.* Thus, the officer's extensive experience was but one factor that should have been considered as part of the "totality of the circumstances." *Id.* But, contrary to Faz's contention, *Curtis* does not require an arresting officer have "extensive experience" before he can have reasonable suspicion to detain a driver for driving while intoxicated.

The issue presented in this case does not turn on Officer Sedillo's experience, but instead turns on whether under the totality of circumstances, Officer Sedillo had an objectively reasonable basis to justify the investigative detention of Faz. *See Leming*, 2016 WL 1458242, at *8 (explaining that the standard for reasonable suspicion "is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention"). Recently, in *Leming*, 2016 WL 1458242, at *8, the court of criminal appeals reiterated that weaving back and forth under certain circumstances can support reasonable suspicion to detain a driver. In doing so, the court of criminal appeals did not apply a standard requiring the arresting officer to have "extensive experience," but instead looked at all the evidence presented. *Id.*

In *Leming*, the court of criminal appeals emphasized that the "United States Supreme Court has recently acknowledged that observation of 'dangerous behaviors' such as weaving back and forth across the roadway and crossing the center line 'would justify a traffic stop on suspicion of drunk driving.'" *Id.* (quoting *Navarette v. California*, 134 S. Ct. 1683, 1690-91 (2014)). The court of criminal appeals noted that while weaving back and forth might "'be explained by, for example, a driver responding to an unruly child or other distraction,' the Supreme Court has 'consistently recognized that reasonable suspicion need not rule out the possibility of innocent conduct.'" *Id.* (quoting *Navarette*, 134 S. Ct. at 1691). "It is, after all, only an 'investigative detention.'" *Id.* "So long as the intrusion does not exceed the legitimate scope of such a detention and evolve into the greater intrusiveness inherent in an arrest-*sans*-probable-cause, the Fourth Amendment will tolerate a certain degree of police proaction." *Id.* (quoting *Derichsweiler*, 348 S.W.3d at 916).

In considering the evidence presented, the court of criminal appeals held reasonable suspicion justified the investigative detention. *Id.* The court explained that the arresting officer had testified that he had been told by dispatch that a driver had seen a white Jeep "swerving from side to side." *Id.* The officer was able to catch up to the driver in question and observed the Jeep "driving unusually slowly and 'swerving' fairly radically—at least within the width of its own dedicated lane." *Id.* The court noted that the dash cam video confirmed the officer's testimony. *Id.* The officer also observed "the Jeep nearly strike the curb." *Id.* The court emphasized that "[r]easonable suspicion depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at *9. "Under that commonsense approach, we can appropriately recognize certain driving behaviors as sound indicia of drunk driving." *Id.* The court held that "on the facts of this case, [the arresting officer] had an objectively reasonable basis to justify at least a temporary detention to investigate the cause of Appellant's unusual driving, even if Appellant's 'erratic driving' (as the trial court aptly characterized it) might ultimately have

proven to derive from some other, innocent cause." *Id.* The court of criminal appeals emphasized that a determination that reasonable suspicion exists "need not rule out the possibility of innocent conduct." *Id.* (citations omitted). "The possibility of an innocent explanation does not deprive the [detaining] officer of the capacity to entertain reasonable suspicion of criminal conduct." *Id.* (quoting *Woods*, 956 S.W.3d at 37) (alteration in original). "Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal." *Id.* (quoting *Woods*, 956 S.W.2d at 37). The court of criminal appeals stressed that it "would deem it counterproductive and contrary to common sense to set the reasonable-suspicion bar for driving while intoxicated so high that law enforcement must hesitate to investigate such hazardous driving for fear that the stop will later be invalidated." *Id.*

Here, Officer Sedillo testified that he had been a licensed peace officer for seventeen years. He had been assigned to traffic enforcement for three years. With regard to DWI training, he had completed the NHTSA Practitioner Course, and before he patrolled alone, he had participated in field training with another officer for two weeks. Officer Sedillo testified that he saw the pickup truck driven by Faz drift "half way onto the improved shoulder" and then back into the lane. The pickup truck then drifted again, crossing the right line onto the shoulder. The pickup truck drifted back toward the left side of the lane and then crossed back to the right line and onto the shoulder again. Deputy Sedillo testified that when the pickup truck drifted toward the left, it caused the vehicle in the left lane to also move left to create space between the vehicles. Deputy Sedillo testified that in less than a minute, he saw the pickup truck drift off the lane of travel and onto the shoulder three separate times. The dash camera video confirms this account.

Deputy Sedillo testified that based on his DWI training and experience, this type of driving indicated that the driver of the pickup truck "wasn't able to operate the vehicle within the lane," causing a danger to other vehicles on the highway. Deputy Sedillo testified that based on his DWI

training and experience, the driving pattern of the driver of the pickup truck was consistent with a person who was under the influence of alcohol or drugs. Deputy Sedillo pointed to the manner in which the driver "was operating the vehicle and the day and time." Deputy Sedillo emphasized that it was "a Saturday night" and almost midnight. He explained that most of his "DWI arrests are on Friday and Saturday nights" because "a lot of people are off of work and they're able to go out and consume alcoholic beverages." According to Deputy Sedillo, the driving he witnessed was "not normal driving behavior." Given Deputy Sedillo's testimony and the dash camera video, we cannot find error on the part of the trial court in denying Faz's motion to suppress. The evidence supports the trial court's finding that Deputy Sedillo had reasonable suspicion to conduct an investigatory detention. *See Leming*, at *9. We therefore overrule Faz's first issue.

### MOTION FOR NEW TRIAL

In his second issue, Faz argues that the trial court erred in denying his motion for new trial because "significant misinformation motivated appellant's plea," thus rendering his plea "involuntary." Faz argues that he believed he was entering into a plea-bargain agreement "calling for a cap of 10 years making him eligible for an appeal bond." Appellant, however, has no right to appeal this issue. *See* TEX. R. APP. P. 25.2.

After Faz's motion to suppress was denied, he entered into a plea-bargain agreement with the State. The written plea-bargain agreement states that punishment is to be assessed at ten years. It does not provide for a cap of ten years. At the plea hearing, the trial court stated the following to Faz:

> [The written plea-bargain agreement] tells me that your plea bargain is that — you have agreed that you have been previously convicted of one felony, which is the repeater paragraph, and we'll get to that in a little bit. Punishment is to be assessed at ten years in the Texas Department of Criminal Justice Institutional Division. There's a $1500 fine. The State makes no recommendation on your application for community supervision. You're not eligible for deferred in a DWI case. So the only thing you're eligible for is [] regular probation, which is community supervision.

> They're [the State] not going to speak about that. They're going to be silent on that. There's a two-year driver's license suspension. Whether or not you receive community supervision — that is entirely [up] to me, the Court. Do you understand that?

Faz replied, "Yes." The trial court then asked Faz and his lawyer whether that was their understanding of the agreement. Both replied in the affirmative. The trial court then asked Faz how he pled to the offense of driving while intoxicated as a third offense. Faz replied, "Guilty." The trial court asked if Faz was pleading guilty because he was guilty. Faz replied, "Yes." The trial court confirmed, "For no other reason? Nobody threatened, coerced, or forced you into entering this plea?" Faz replied, "No, sir." The trial court then found that the plea of guilty was entered voluntarily. In its judgment, the trial court assessed punishment at ten years in accordance with the plea-bargain agreement. The trial court then signed a certification of defendant's right of appeal, certifying that this criminal case "is a plea-bargain case, but matters were raised by written motion filed and ruled on before trial and not withdrawn or waived, and the defendant has the right of appeal." Thus, the trial court recognized that Faz had a right to appeal matters raised by written motion filed and ruled on before trial and not withdrawn or waived. With regard to this issue, however, Faz is not appealing a pretrial motion raised by written motion filed and ruled on before trial. Instead, Faz is appealing the trial court's ruling on his motion for new trial.

> Texas Rule of Appellate Procedure 25.2(a)(2) provides the following:

> In a plea bargain case—that is, a case in which a defendant's plea was guilty or nolo contendere and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant—a defendant may appeal only:

> (A) those matters that were raised by written motion filed and ruled on before trial; or

> (B) after getting the trial court's permission to appeal.

Thus, pursuant to rule 25.2, Faz can only appeal the ruling on his pretrial motions or any other matter for which the trial court had granted him permission to appeal. TEX. R. APP. P. 25.2(a)(2).

However, Faz's motion for new trial is not a pretrial matter filed and ruled on before trial. Nor did the trial court give Faz permission to appeal its ruling on Faz's motion for new trial. Therefore, pursuant to rule 25.2, Faz does not have the right to appeal the trial court's ruling on his motion for new trial.

In his brief, Faz contends that a "conviction cannot be sustained when a plea of guilty or no contest has been motivated by significant misinformation conveyed by the defendant's counsel or some other officer of the court." In support of this statement, Faz cites *Ex parte Klem*, 269 S.W.3d 711 (Tex. App.—Beaumont 2008, pet. ref'd), and *Messer v. State*, 757 S.W.2d 820, 824 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd). *Ex parte Klem*, 269 S.W.3d at 713-14, involves an applicant filing a petition for a writ of habeas corpus in the trial court and appealing the trial court's denial of the application to the appellate court; *Ex parte Klem* is not a case involving a direct appeal from the trial court's judgment. The other case cited by Faz, *Messer*, 757 S.W.2d at 821, is a case involving a direct appeal from the trial court's judgment. However, *Messer* predates rule 25.2 and is no longer good law. Since *Messer*, the Texas Court of Criminal Appeals has explicitly stated that in plea-bargain cases falling under rule 25.2, a defendant may not raise the issue of voluntariness of his plea on direct appeal. *See Griffin v. State*, 145 S.W.3d 645, 648-49 (Tex. Crim. App. 2004); *Cooper v. State*, 45 S.W.3d 77, 82-83 (Tex. Crim. App. 2001). We therefore overrule Faz's second issue.

### CONCLUSION

Having overruled both issues on appeal, we affirm the judgment of the trial court.

Karen Angelini, Justice

Do not publish