

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-10-00512-CR

JAYSON VESTUS RITCHIE                                                    APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

----------

## FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

The trial court denied Appellant Jayson Vestus Ritchie's motion to suppress evidence obtained after the police stopped his car. Appellant reserved his right to appeal the trial court's ruling, and pled guilty to driving while intoxicated—felony repetition.[2] The trial court fined Appellant $1,350 and placed

---

[1]See Tex. R. App. P. 47.4.

[2]Tex. Penal Code Ann. § 49.09(b)(2) (West Supp. 2011).

him on ten years' community supervision. In his sole point on appeal, Appellant contends that the trial court abused its discretion by denying his motion to suppress because the officer stopped him without reasonable suspicion. We affirm.

## Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts and reviewing de novo the trial court's application of law to facts that do not turn on assessments of credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005); *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997).

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, as the trial court did here, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record also resolve the legal issue. *Id.* at 818.

## The Trial Court's Findings and Conclusions

After the hearing on Appellant's motion to suppress, the trial court made the following findings of fact:

Officer Mario Merendon of the Keller Police Department stopped this Defendant March 28, 2008[,] shortly after 12:18 a.m. on Davis Blvd. in Keller, Texas.  The officer stopped him for a number of reasons, all of which contributed to and resulted in the stop.  The Defendant's driving was recorded by Officer Merendon's car video and subsequently introduced into evidence.  The reasons for the stop were as follows:

1).  The Defendant was in the right hand lane and veered out of the lane, completely crossing the white line, then returned to the lane.  This is a violation of 545.060 of the Transportation Code (failing to maintain a single lane) if it is done in an unsafe manner.  The Officer testified that it was unsafe due in part to the fact that he failed to signal his intent to make a lane change.  It is also dangerous because it gives other drivers no notice that the Defendant may be moving into their lane; also, a person not staying in their own lane can cause accidents with other drivers, or hit a stationary object.

2).  *The Defendant then crossed over a striped area dividing the main* portion of the traveling highway and a turn lane for some private business.  This is a violation of 545.004 of the Transportation Code (failure to comply with a traffic control device).

3).  The Defendant was driving late at night, was weaving, failing to signal lane changes, and was exceedingly slow to respond when the Officer finally did activate his overhead lights.  He also did turn on his turn signal when the officer was pulling him over, then turned it off, and then turned it on.  His indecisiveness may also have been an indication that he was impaired.  When he pulled the Defendant over he then smelled alcohol.  The arrest in this case was effected without a warrant.

All of the factors listed above were considered by Officer Merendon and were operative in his decision to detain and investigate the Defendant for DWI.

Based on these findings, the trial court concluded that the officer had properly detained Appellant because Appellant had committed two traffic violations, and independent of these violations, the officer had reasonable suspicion to investigate whether Appellant had been driving while intoxicated (DWI).

## The Issue

The evidence at the suppression hearing consisted solely of the testimony of Keller Police Officer Mario Merendon and a DVD copy of the officer's in-car video record of the events leading up to and including the stop.

Appellant contends that the trial court's failure to suppress the fruits of the stop violated his rights under the Fourth Amendment to the United States Constitution, Article I, Section 9 of the Texas constitution, and code of criminal procedure article 38.23. He argues that, contrary to the trial court's findings of fact and conclusions of law, the evidence shows that Officer Merendon observed no traffic violations and had no reasonable suspicion to investigate Appellant for DWI. We need not decide whether the evidence supports the trial court's conclusion that the officer reasonably suspected that Appellant had committed any traffic offenses because, having examined the evidence in the light most favorable to the trial court's ruling, we hold that it supports the trial court's conclusion that reasonable suspicion existed to stop Appellant for DWI.

4

## Reasonable Suspicion

The Fourth Amendment protects citizens against unreasonable searches and seizures by government agents.[3]  U.S. Const. amend. IV; *see State v. Garcia-Cantu*, 253 S.W.3d 236, 238 (Tex. Crim. App. 2008).  A seizure is reasonable under the Fourth Amendment if the agent reasonably suspects the person of engaging in criminal activity.  *Terry v. Ohio*, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000).

The court of criminal appeals has held that traffic stops are seizures within the meaning of the Fourth Amendment.  *Corbin v. State*, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002); *see Garza v. State*, 771 S.W.2d 549, 558 (Tex. Crim. App. 1989); *see also Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979).  Because a routine traffic stop typically involves only a short, investigative detention, as opposed to a custodial arrest, we analyze traffic stops under the principles the Supreme Court developed for investigative detentions in *Terry*.  392 U.S. at 22, 88 S. Ct. at 1880; *see Berkemer v. McCarty*, 468 U.S.

---

[3]Where, as in this case, the appellant does not separately brief state and federal constitutional claims, we assume that he claims no greater protection under the state constitution than that provided by the federal constitution. *Fowler v. State*, 266 S.W.3d 498, 501 n.2 (Tex. App.—Fort Worth 2008, pet. ref'd) (en banc).  Therefore, we analyze Appellant's claim solely under the Fourth Amendment to the United States Constitution, following guidelines set by the United States Supreme Court in interpreting the Fourth Amendment. *See State v. Guzman*, 959 S.W.2d 631, 633 (Tex. Crim. App. 1998).

420, 104 S. Ct. 3138 (1984); *Martinez v. State*, 236 S.W.3d 361, 369 (Tex. App.—Fort Worth 2007, no pet.).

A police officer conducts a lawful temporary detention when he has reasonable suspicion to believe that an individual is violating the law. *Ford*, 158 S.W.3d at 492; *Ballentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts would lead the officer to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492; *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). This is a wholly objective test that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop existed at the time the officer made the stop. *Ford*, 158 S.W.3d at 492; *Garcia*, 43 S.W.3d at 530; *see Fowler*, 266 S.W.3d at 502. A reasonable-suspicion determination is made by looking at the totality of the circumstances. *Ford*, 158 S.W.3d at 492–93; *Garcia*, 43 S.W.3d at 530.

**Analysis**

According to the trial court's conclusions of law, reasonable suspicion existed to support Appellant's detention to investigate him for DWI due to the following specific facts: Appellant was driving late at night, weaving out of his lane, failing to signal lane changes, driving over marked prohibited areas, was "exceedingly" slow to respond when the officer activated his emergency lights,

6

activated his turn signal, turned it off again, turned it on again, and smelled of alcohol when the officer approached him.

Because our inquiry is whether Appellant's detention was supported by reasonable suspicion, it is important to note when that detention began. A Fourth Amendment seizure occurs when a reasonable person would believe he or she is not free to leave and has yielded to a government agent's show of authority or has been physically forced to yield. *California v. Hodari D*., 499 U.S. 621, 627–28, 111 S. Ct. 1547, 1551–52 (1991); *Johnson v. State*, 912 S.W.2d 227, 236 (Tex. Crim. App. 1995); *Wiseman v. State*, No. 02-06-00021-CR, 2006 WL 3334171, at *3 (Tex. App.—Fort Worth Nov. 16, 2006, pet. ref'd) (mem. op., not designated for publication). Therefore, we hold that as soon as Appellant pulled over to the side of the road and yielded to the officer's show of authority in the form of flashing emergency lights, he was detained. *See Hodari D.*, 499 U.S. at 627–28, 111 S. Ct. at 1551; *Corbin*, 85 S.W.3d at 276–79; *see also Brendlin v. California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 2405 (2007) (stating that a police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure).

In determining whether reasonable suspicion justified the detention, we do not consider evidence obtained after Appellant was detained. Of the above cited facts relied upon by the trial court in concluding that reasonable suspicion supported the detention for DWI, evidence that Appellant smelled of alcohol

7

when the officer approached his window falls within this category and does not, therefore, figure into our analysis.

Other facts, however, cited from the time the officer began following Appellant to the time that Appellant yielded to his show of authority—that is, when Appellant pulled over and stopped—do figure in the analysis and will be compared against the evidence in the record. These include the following: that Appellant was driving late at night, weaving out of his lane, failing to signal lane changes, driving over marked prohibited areas, was "exceedingly" slow to respond when the officer activated his emergency lights, engaged his turn signal, turned it off again, and turned it on again.

*Driving Late at Night*

Officer Merendon testified that he was working the midnight shift when, at approximately 12:18 a.m., he first observed Appellant's Chevy Tahoe. A DVD copy of the officer's dashboard video recording corroborates that time and was obviously made at night: the roadway is dark and the few vehicles depicted have their headlights on. The evidence supports the finding that Appellant was driving late at night.

*Weaving*

Officer Merendon also testified that he was following Appellant's Tahoe in the right of two southbound lanes on Davis when he saw it "veer off to the right of the lane" so that the "right tires crossed completely over" a solid white line separating a striped area from the rest of the roadway. He further testified that

8

he "observed the tires completely cross that white line and then continue back onto the right lane." Then, within seconds, Appellant crossed over the striped portion of the roadway separating the two southbound lanes and his tires rolled onto the striped line and partially into the left lane.

The DVD shows the right tires of the Tahoe traveling on the solid white stripe separating the right lane from a diagonally striped area between the right hand lane and a turn lane leading off the roadway. The DVD also displays the time in seconds. According to the DVD, the recording commenced at 00:18:14. Appellant's right tires can be seen approaching the solid white line at 00:18:29, they are on top of the line at 00:18:30, and are off it again by 00:18:31. The Tahoe appears to weave slightly within its lane and then, at 00:19:00, it approaches the dashed white line separating the right southbound lane from the left. The left tires next appear to touch the dashed line at 00:19:06 and cross completely over it between 00:19:07 and 00:19:08. By 00:19:09, the car is again completely within the right hand lane.

Although the weaving is neither pronounced nor extreme, it is weaving nonetheless, and in the light most favorable to the trial court's ruling, we must therefore hold that the evidence supports the trial court's finding that Appellant weaved out of his lane. *See Wiede*, 214 S.W.3d at 24; *Kelly*, 204 S.W.3d at 818–19.

*Failing to Signal Lane Changes*

The prosecutor asked Officer Merendon whether he saw Appellant "on multiple occasions change lanes or at least go out of the lane without signaling his intention to do so?" Because the DVD does not show Appellant actually changing lanes but, as we have discussed, it does show him weaving, we interpret Officer Merendon's response, "correct," to refer to the second part of the State's question, and therefore evidence that he did not see Appellant use a turn signal when Appellant weaved outside his lane.

But, as the State pointed out, a driver is required to signal an intention to change lanes. *See* Tex. Transp. Code Ann. § 545.104(a) (West 2011) ("An operator shall use the signal . . . to indicate an intention to turn, change lanes, or start from a parked position."). The State begged the question that Appellant's weaving indicated his intent to change lanes, which would require that he signal that intent by using a turn signal. We fail to see how evidence of weaving supports an inference that Appellant intended to change lanes. Indeed, it seems more likely to imply the contrary. Moreover, evidence that Appellant stayed mostly in one lane of travel, deviating twice by at most a tire's width, suggests that he did not intend to change lanes. Either Appellant intended to stay within his lane but weaved or he intended to change lanes but failed to signal. Absent evidence that Appellant intended to change lanes to counter the evidence that he did not, we hold that even in the light most favorable to the trial court's ruling, the

10

finding that Appellant failed to signal lane changes is not supported by the record.

*Driving Over Marked Prohibited Areas*

In its conclusions of law, the trial court noted that one of the facts that supported its conclusion that the officer had reasonable suspicion was that Appellant was "driving over marked prohibited areas." In its findings of fact, however, the trial court did not specifically find that Appellant drove over marked prohibited areas. Officer Merendon testified that he witnessed the right tires of Appellant's Tahoe cross "completely over the solid white line" of a "striped area" that is "clearly not a marked lane for traffic" and that cars are not supposed to drive over and through. As discussed above in connection with the trial court's finding that Appellant was weaving, the DVD shows Appellant's right tires traveling on the solid white line for approximately one second. Our review of the DVD does not, however, show that the tires went so far as to support a conclusion that Appellant crossed completely over the line and actually drove onto the striped area. We hold, therefore, that even when viewed in the light most favorable to the trial court's ruling, the evidence does not support a finding that Appellant drove "over marked prohibited areas," as distinct from a finding that he merely weaved to the right slightly out of his lane. We consider this evidence, therefore, as additional support for the trial court's finding that Appellant weaved from his lane and not for a finding that he drove into a prohibited area.

11

*"Exceedingly" Slow to Respond*

The trial court found that Appellant was "exceedingly" slow to respond to Officer Merendon's emergency lights. Officer Merendon testified that Appellant was traveling at forty miles an hour, that it took Appellant approximately twenty to twenty one seconds to respond, and that Appellant's slow response concerned him that Appellant might be trying to hide something or that "if a person was intoxicated, they may be slow to respond."

The DVD shows that Appellant pulled off the road approximately forty seconds after the officer activated his emergency lights. There is no evidence in the record of what is a normal or average response time; thus, it is difficult to assess the trial court's use of the adverb "exceedingly" in characterizing the speed (or lack thereof) of Appellant's response. However, from our review of the DVD, it is apparent that Appellant did not pull over immediately after Officer Merendon activated his emergency lights, and in that regard, the evidence viewed in the light most favorable to the ruling supports a finding that Appellant's response was delayed if not "exceedingly slow."

*Turn Signal On, Off, On*

Finally, the trial court equates Appellant's use of his turn signal with "indecisiveness" that might indicate Appellant's impairment. The DVD shows that during a six second time span, the turn signal came on, went off, and came on again before Appellant pulled over, and Officer Merendon testified that this

12

suggested that Appellant might have been intoxicated. Viewed in the appropriate light, we hold that the evidence supports the trial court's finding.

## The Supported Findings Add Up to Reasonable Suspicion

Having viewed the evidence in the light most favorable to the trial court's ruling and having compared the record evidence with the trial court's findings, we hold that the following are supported by the evidence: Appellant was driving late at night, weaved, was slow to respond, and used his turn signals in a way to suggest a degree of impairment. The question now is whether these facts, given the totality of the circumstances, support the trial court's conclusion that Officer Merendon had reasonable suspicion to stop Appellant for DWI.

In *Curtis v. State*, a novice highway trooper and his field-training officer, who had years of experience and specialized training in detecting intoxicated drivers, saw Curtis's vehicle weaving in and out of its lane over a short distance late at night. 238 S.W.3d 376, 377 (Tex. Crim. App. 2007). The court of appeals held that the trial court had erred by denying Curtis's motion to suppress because the troopers did not have reasonable suspicion to stop his vehicle for DWI. *Id.* The court of criminal appeals reversed, holding that the court of appeals improperly applied the standard of review by failing to consider the totality of the circumstances and rational inferences from the facts, both of which supported the trial court's conclusion that the troopers had reasonable suspicion to investigate Curtis for DWI. *Id.* at 381.

13

In *Dunkelburg v. State*, this court held that reasonable suspicion for DWI was shown when the officer testified that he stopped the appellant because he believed there was a "possibility" that the appellant was driving while intoxicated. 276 S.W.3d 503, 507 (Tex. App.—Fort Worth 2008, pet. ref'd). The officer's dashboard video supported the officer's testimony that the appellant was weaving, crossed the lane divider at least once, and was slow to react to the officer's emergency lights. *Id.* The officer further testified that in his experience, intoxicated drivers are frequently encountered at that time of night and that his training showed that weaving is one of the clues that a driver is intoxicated. *Id.*

In *James v. State*, a patrolling sheriff's deputy believed that the driver of a Jeep Cherokee might have been impaired after he saw the Cherokee leave a rest stop, fail to signal as it entered the freeway, cross the center stripe between the northbound lanes, and then veer back over the yellow stripe onto the shoulder. 102 S.W.3d 162, 167 (Tex. App.—Fort Worth 2003, pet. ref'd). This court held that the officer had reasonable suspicion to stop the driver for DWI. *Id.* at 172.

In *McQuarters v. State*, this court held that a late night traffic stop was justified based on reasonable suspicion that the appellant, whose vehicle crossed the left lane stripe twice while traveling at slow speed in the left lane of the interstate, was intoxicated. 58 S.W.3d 250, 253, 255 (Tex. App.—Fort Worth 2001, pet. ref'd).

14

Applying these precedents, considering the totality of the circumstances in the light most favorable to the trial court's ruling, and keeping in mind that the test for reasonable suspicion is wholly objective and disregards the subjective intent of the officer, we hold that the evidence in the record supports the trial court's conclusion that the officer had reasonable suspicion to justify stopping Appellant to investigate him for DWI. Accordingly, we overrule Appellant's sole issue.

## Conclusion

Having overruled Appellant's sole issue, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

LIVINGSTON, C.J., concurs without opinion

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 5, 2012